BEST AUTO, Appellant,

v.

AUTOHAUS, LLC d/b/a Ewing Autohaus, Appellee.

No. 05–09–01452–CV.

Court of Appeals of Texas, Dallas.

April 7, 2011.

Rehearing Overruled May 25, 2011.

Billy R. McGill, Dallas, TX, for Appellant.

Randy A. Nelson, Thompson, Coe, Cousins & Irons, L.L.P., Dallas, TX, for Appellee.

Before Justices MOSELEY, FILLMORE, and MYERS.

## OPINION

Opinion By Justice MYERS.

Best Auto appeals the take-nothing summary judgment rendered on its claims against Autohaus, LLC d/b/a Ewing Autohaus (Ewing). Best Auto brings seven issues contending the trial court erred by sustaining Ewing's objections to Best Auto's summary judgment evidence and by granting Ewing's motion for summary judgment on Best Auto's claims for fraud, negligent misrepresentation, and violation of the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA). We conclude the trial court did not err in granting Ewing's no-evidence motion for summary judgment, and we affirm the trial court's judgment.

## BACKGROUND

In an auction on March 29, 2007, Best Auto purchased the vehicle that is the subject of this lawsuit, a 2002 Mercedes–Benz CL600C with 57,045 miles, for $27,595. Best Auto purchased the car with the intention of reselling it for a profit. The manufacturer's warranty had expired when the car exceeded 50,000 miles.

On March 8, 2007, about two weeks before the auction, the previous owner of the vehicle took it to Ewing, a Mercedes dealership and servicer, which estimated the necessary repairs to the vehicle would cost about $10,000. Best Auto's owners, Nikolay Vladov and Teodora Arsova, were un-

aware of the need for these repairs when Best Auto purchased the vehicle. However, they were aware that the "check engine" light was illuminated.

On April 9, 2007, Vladov took the vehicle to Ewing because of the check-engine light and because the car was running "rough." A service manager at Ewing showed Vladov a copy of the repair estimate given to the previous owner, and the service manager told Vladov that the oil-level sensor was leaking. In fact, the oil-pressure sensor was leaking. Vladov declined to have Ewing perform the service. The vehicle was not examined by a Ewing employee that day.

Vladov took the vehicle back to Ewing on May 4, 2007 because of the check-engine light. A Ewing mechanic examined the car and showed Vladov oil on the wiring harness, coils, sensors, and the engine control module. The mechanic estimated it would cost $6,875 to repair these parts, and the estimate did not include the cost to fix the oil leak that was damaging the parts. Vladov again declined to have Ewing perform the repairs. Relying on the advice of Ewing's mechanics, Vladov bought several parts for the car, including an oil-level sensor and an oil-pressure sensor, to repair the car himself. After installing the parts, the check-engine light turned off. However, after less than 5,000 miles, the check-engine light came on and the car stalled. Then the car's suspension collapsed, rendering it undrivable.

Vladov asked Mercedes if the oil leak was subject to a recall, and the company told him it was not. Vladov later learned that Mercedes had issued a service campaign for certain defective oil-pressure sensors.[1] The service campaign required

---

1. According to the affidavit of Michael Wylie, Mercedes's Service and Parts Operations Manager, recalls are campaigns issued by the National Highway Traffic Safety Administra-

the service departments of Mercedes dealers to check the oil-pressure sensors of cars within a range of VIN numbers. If the date code stamped on the oil-pressure sensor showed it was manufactured before a particular date, it was subject to the service campaign and would be replaced. If the oil-pressure sensor was manufactured after a particular date, dealers were to inspect the sensor and replace it if it was leaking. Dealers were also to replace any other parts damaged by a leaking oil-pressure sensor. Dealers were instructed to paint a stripe on any replacement oil-pressure sensors.

Best Auto's vehicle was within the range of vehicles subject to the service campaign. However, the oil-pressure sensor was manufactured after the date of those subject to the service campaign. The service campaign was performed on the vehicle in October 2005, which made the campaign "closed" as to the vehicle.

Mercedes provided an emissions warranty covering parts relating to emissions for eight years or 80,000 miles. The vehicle's wiring harness and engine control module were included under the warranty. However, the emissions warranty applied only to vehicles that had failed an "EPA approved emissions short test."

Best Auto sued Ewing for fraud, negligent misrepresentation, and DTPA violations for representing and leading Best Auto to believe that the oil leakage was not covered by a recall or service campaign requiring Ewing to cover the cost of repairing the oil leakage; failing to disclose that the oil leakage was covered by a recall or service campaign; representing that the

engine control module and mounting hardware were not covered by the emissions warranty; and failing to disclose that the engine control module and mounting hardware were covered by the emissions warranty.[2] Ewing moved for traditional and no-evidence summary judgment, which the trial court granted, rendering judgment that Best Auto take nothing.

## SUMMARY JUDGMENT

Best Auto's first six issues assert the trial court erred in granting Ewing's motion for summary judgment.

### Standard of Review

We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *See* TEX.R. CIV. P. 166a(i); *Flood v. Katz*, 294 S.W.3d 756, 762 (Tex.App.-Dallas 2009, pet. denied). Thus, we must determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *See Flood*, 294 S.W.3d at 762. When analyzing a no-evidence summary judgment, we consider all the evidence in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the movant. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006) (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex.2005)). A no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003). "More than a scintilla

tion based on a determination that a defect in the vehicle creates an unreasonable safety risk. Service campaigns are voluntarily instituted by Mercedes for problems that do not pose a safety risk.

**2.** Best Auto also sued Mercedes–Benz USA and the previous owner of the vehicle. After the trial court granted Ewing's motion for summary judgment, the court severed Best Auto's claims against Ewing into a separate cause.

of evidence exists when the evidence rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions." *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997)). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id.* (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)).

### Misrepresentation

■ Best Auto sued Ewing for fraud, negligent misrepresentation, and DTPA violations. Each of these causes of action requires that the defendant have made a false representation. *See* TEX. BUS. & COM. CODE ANN. § 17.46(b)(5), (13) (West Supp. 2010) (DTPA); *Aquaplex, Inc. v. Rancho La Valencia, Inc.,* 297 S.W.3d 768, 774 (Tex.2009) (fraud); *Fed. Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991) (negligent misrepresentation). Liability for fraud and a DTPA violation may also follow from a failure to disclose information. *See* TEX. BUS. & COM.CODE ANN. § 17.46(b)(24) (DTPA); *Bradford v. Vento,* 48 S.W.3d 749, 755 (Tex.2001) (fraud).

Best Auto alleged that Ewing misrepresented, through words or silence, that the engine leak was covered by a recall or other campaign requiring Ewing and Mercedes to repair the oil leak and its damage at no cost to Best Auto, and that the damage to the engine control module and its hardware were covered by a written warranty. Ewing's no-evidence motion for summary judgment asserted that Best Auto had no evidence of any misrepresentation or duty to disclose by Ewing.

### *Service Campaign*

■ Best Auto argues the service campaign required Ewing to repair the oil leak and its damage at no cost to Best Auto. Best Auto presented some evidence that the oil-pressure sensor was the source of the oil leak, and Best Auto asserts Ewing was required by the service campaign to replace the oil-pressure sensor and repair the damage it caused.

The service campaign bulletin from Mercedes instructed dealers on the procedure for the service campaign. Dealers were to check the oil-pressure sensor to see if it had a paint mark, indicating the sensor had already been replaced. If the sensor lacked the paint mark, then the dealer was to remove the sensor and check the date code. If the date code was before 1291, the dealer was to replace the sensor. If the date code was 1291 or later, the dealer was to check the sensor for leaking, replace it if it leaked, or reinstall the sensor if it did not leak. If the dealer installed a new sensor, the dealer was to place a white paint mark on it. If oil had gotten onto surrounding engine components, the dealer was to replace those components, if necessary.

Mark Byrd, a technical specialist for Mercedes, testified he went to Vladov's house to inspect the vehicle. Byrd testified he inspected the sensor that had been removed from the vehicle, and he "was able [to] ascertain that the production date of the sensor fell beyond the date referenced in the service campaign and, therefore, did not need to be replaced if it was not currently leaking at the time of the performance of the campaign." The computerized record of the vehicle's maintenance history, which Mercedes called "Vehicle Master Inquiry" or VMI, showed the service campaign was performed on the vehicle on October 12, 2005 and that the campaign was now "closed" as to the vehicle. Byrd testified that a component which fails after the service campaign is performed "has no relation to the service

campaign at that point." Byrd also testified that if a service campaign is closed as to a vehicle, then a dealer has no authority to open the campaign.

On appeal, Best Auto does not dispute that the sensor was outside the date code for replacement. Instead, Best Auto argues the evidence is disputed whether the service campaign was performed on the vehicle. Best Auto argues that the absence of a paint mark on the sensor showed it was not replaced, which Best Auto appears to argue means the service campaign had not been performed. This argument lacks merit because the campaign's procedure provided that for sensors with a date code outside 1291, the sensor was not to be replaced unless it was leaking. The VMI showed the service was performed. The evidence showed the absence of the paint mark meant the sensor was not leaking, and thus did not have to be replaced, when the service was performed in 2005. Under these facts, the absence of the paint mark was not evidence that the service campaign had not been performed on the vehicle.

Best Auto also argues there is some evidence that service campaigns could not be "closed" because a Mercedes recall bulletin for an unrelated problem stated, "Please also note that Recall and Service Campaigns do not expire...." However, the two immediately preceding sentences in the bulletin state: "VMI must always be checked before performing campaigns to verify that the campaign is required on a specific vehicle. VMI always overrides the bulletin in reference to a specific vehicle's inclusion in a particular campaign." The summary judgment evidence includes VMIs for the vehicle dated March 8, 2007 (the date the prior owner brought the vehicle to Ewing) and April 9, 2007 (the date Best Auto first took the vehicle to Ewing). Both VMIs state that the service campaign was "closed," and both show the "Repair

Dt" for the service campaign was October 12, 2005. Thus, although the service campaign may not have expired, the VMI showed the service campaign was not required because the campaign was closed as to the vehicle, which overrode the service campaign bulletin. The statement in the recall bulletin did not raise a genuine issue of material fact regarding whether the service campaign could be closed.

Best Auto also argues that, "at the very least, Ewing should have disclosed to Best Auto that there was a service campaign, that it had been closed by a Florida dealership and that Ewing did not understand why it had been closed, since the oil pressure sensor obviously had not been replaced." The service campaign did not necessarily require replacement of the sensor because its date code was outside those requiring mandatory replacement. The record contains no evidence that Ewing did not understand why the service campaign had been closed. Best Auto's argument lacks merit.

The record contains no evidence that the oil leak was the subject of an applicable service campaign or recall requiring Ewing to repair the leak and the damage it caused at no cost to Best Auto. Accordingly, there is no evidence that Ewing falsely represented that it was not required to repair the leak or that it had a duty to inform Best Auto that the leak was subject to a service campaign.

### Emissions Warranty

■ Best Auto asserts it presented some evidence that Ewing was required to replace the engine control module and other engine parts under the emissions warranty. Mercedes's federal emissions warranty provided it would replace certain parts, including the engine control module, wiring harness, and ignition coils, if they had defects causing them not to conform with the Federal Clean Air Act for a peri-

od of eight years or 80,000 miles. The warranty stated,

> You may present a claim under this warranty immediately after your vehicle has failed an EPA approved emission short test if, as a result of that failure, you are required by law to repair the vehicle to avoid the imposition of a penalty or sanction. You do not need to suffer the loss of the right to use the vehicle, pay a fine, or incur repair expenses before bringing this claim.

There is no evidence that the vehicle failed an EPA approved emission short test.

Best Auto argues that the emissions warranty was applicable because the vehicle would have failed the emissions test because its check-engine light was on. The warranty's requirements, however, are clear: the claim under the warranty may be presented "immediately after" the vehicle fails the emissions test. Nothing in the warranty required Ewing to perform repairs under the warranty before the vehicle failed the emissions test.

Because no evidence showed the vehicle had failed an EPA approved emission short test, any defects in the engine control module or other parts were not subject to replacement under the emissions warranty. Accordingly, Ewing did not misrepresent the emissions warranty to Best Auto, and Ewing was not obligated to tell Best Auto that the parts were subject to replacement under the emissions warranty.

### Conclusion

We conclude Best Auto presented no evidence of a misrepresentation or a duty to disclose by Ewing. Accordingly, the trial court did not err in granting Ewing's no-evidence motion for summary judgment. We need not determine whether the trial court erred in granting Ewing's traditional motion for summary judgment. We overrule Best Auto's first six issues.

### EVIDENTIARY RULINGS

In its seventh issue, Best Auto contends the trial court erred in sustaining two of Ewing's objections to Vladov's affidavit. The statements at issue were that if Vladov had been informed about the service campaign, he would have taken the car back to Ewing or another Mercedes dealer to have the car repaired under the service campaign at no cost to him, after which he likely could have sold the car. These statements presuppose a duty on the part of Ewing to inform Best Auto about the service campaign. As discussed above, the service campaign was closed, so Ewing had no duty to inform Best Auto about the service campaign. Any error in sustaining Ewing's objections to these statements could not have "probably caused the rendition of an improper judgment," and the error would not be reversible. *See* Tex. R.App. P. 44.2(a).

We overrule Best Auto's seventh issue.

### CONCLUSION

We affirm the trial court's judgment.